# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs November 19, 2024

## STATE OF TENNESSEE v. KEION HAYES

**Appeal from the Criminal Court for Sumner County**
**No. 45-2021      Dee David Gay, Judge**

_____

### No. M2024-00352-CCA-R3-CD

_____

The Defendant, Keion Hayes, pleaded guilty in the Sumner County Criminal Court to voluntary manslaughter and aggravated robbery. *See* T.C.A. §§ 39-13-211 (2018) (subsequently amended) (voluntary manslaughter); 39-13-402 (2018) (aggravated robbery). The Defendant received an agreed-upon, eighteen-year sentence. The Defendant filed a motion to withdraw his guilty pleas, which the trial court denied. On appeal, the Defendant argues that the trial court erred by denying his motion. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Chad Turnbow (on appeal and at motion to withdraw plea hearing), Mt. Juliet, Tennessee; and Chad M. Ross (at guilty plea hearing), Gallatin, Tennessee, for the appellant, Keion Hayes.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Ray Whitley, District Attorney General; and Tara Wyllie and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On February 4, 2021, the Defendant and two codefendants, Monterrious Marcreas Moore and Thomas Ray Watson, Jr., were indicted for first degree premeditated murder, first degree felony murder, and aggravated robbery. On March 29, 2021, trial counsel was appointed, and a trial was scheduled for July 18, 2023. However, trial counsel filed a motion to withdraw on July 11, 2023. Counsel's motion stated the attorney-client relationship "had deteriorated" to the extent that communication between counsel and the

Defendant had been "limited and/or denied" by the Defendant. The motion stated that the Defendant made false allegations against counsel "regarding alleged 'promises' that the Defendant" claimed counsel made to the Defendant. The motion stated that the Defendant had questioned counsel's "responsibilities, effectiveness, and zealousness," that the Defendant terminated in-person meetings on July 7 and 11, and that the Defendant refused to meet with counsel on July 8 and 11. The motion stated that counsel's representation was "impossible and impractical in light of the preparation needed for the upcoming trial."

**Motion to Withdraw as Counsel and Guilty Plea Hearings**

On July 13, 2023, the trial court addressed trial counsel's motion to withdraw. The court reviewed trial counsel's motion and requested that the Defendant explain the "problem" leading to his ceasing communication with counsel when the trial was scheduled to begin the following week. The Defendant stated that he filed a complaint with the Board of Professional Responsibility against counsel and that the board responded with a letter, which the trial court read verbatim. The June 22, 2022 letter stated that the Board had reviewed the Defendant's complaint, that only the trial judge could appoint or dismiss attorneys, and that a copy of the Board's letter and the Defendant's complaint would be sent to counsel.

The trial court requested that the Defendant state his complaint against trial counsel, and the Defendant responded that "it's just something I came up with when . . . I first talked to him" and that "I just feel like I'm not being represented." The Defendant stated that counsel had not filed a motion for a speedy trial, although he asked counsel to file the motion on September 16, 2021. The court explained that the trial had been previously scheduled for August 29, 2022, November 7, 2022, and July 18, 2023, and that "we're doing the best we can" to hold the trial. The court noted for the Defendant that it was currently scheduling trials for September 2024 and that the court's docket was "crowded."

The Defendant expressed dissatisfaction with the frequency with which trial counsel spoke to the Defendant and his family and questioned whether counsel was prepared for a trial. The trial court stated that if the Defendant had questions but chose not to meet with counsel, the Defendant's questions would not be answered. The court explained that generally, attorneys began preparing for a trial about one month before the scheduled trial date, that counsel had attempted to meet with him multiple times, and that "right now" the Defendant was the "problem." The court stated that counsel had attempted to meet with the Defendant for four days to prepare for a trial but that the Defendant had refused the meetings. The court stated that the Defendant's conduct was contrary to his desire for a speedy trial and asked what the Defendant wanted from the court. The Defendant requested an attorney who would represent him to the best of his or her ability, and the court responded, "You've got one." The court found that the Defendant had placed counsel "in an extremely difficult position" just before a trial and denied the motion to withdraw. The

court told the Defendant that it was his choice whether he cooperated with counsel, that it was in his best interest to cooperate with counsel, and that counsel would "do the best . . . he can" if the Defendant chose to be uncooperative. The court stated that it appeared the Defendant wanted "to dictate what happens in his case," that he chose not to meet with counsel, and that the Defendant was at fault.

Trial counsel stated that he was unaware of the professional responsibility complaint but understood the Board's response. Counsel said that he attempted to speak with the Defendant earlier before the hearing but that the Defendant refused. Counsel explained that in "recent weeks, months" the State had extended plea offers and that the offers needed to be explained to the Defendant in order for the Defendant to understand "the gravity of those offers." Counsel also noted that the State had decided to sever codefendant Watson's case from the Defendant and codefendant Moore's joint trial and that codefendant Watson would testify against the Defendant. Counsel argued that although he understood the court's position on his motion to withdraw, he did not think representing the Defendant was possible.

At this juncture, Derrick Scretchen, counsel for codefendant Moore, explained that the new plea offers referred to by trial counsel were extended to the Defendant and codefendant Moore earlier before the hearing and that the offers were "a package deal," requiring acceptance by the Defendant and codefendant Moore. Mr. Scretchen requested a recess for both attorneys, the Defendant, and codefendant Moore to discuss the offers. The court granted the request. When court resumed, the Defendant and codefendant Moore presented their respective plea agreements for the court's approval.

The factual basis for the Defendant's guilty pleas was as follows:

> . . . [O]n September 21st of 2020, around 4:30 in the afternoon, the Hendersonville Police Department responded to Dodge's Chicken Store . . . after hearing approximately six to eight gunshots in the area.
>
> Officer Terrazas and another officer, Callahan, were across the road at the Tractor Supply . . . when they heard the shots fired and immediately responded and tried to figure out the origin of those shots.
>
> Within ten minutes . . . the Hendersonville hospital notified law enforcement there was a victim at the hospital that had been shot . . . . The victim . . . was Dorian Banks.
>
> . . . Mr. Banks died from his injuries. He was pronounced dead at the hospital not very long after he arrived. [The investigators] downloaded his phone and they were able to locate a number that Mr. Banks had been

communicating with that was tracked back to Monterrious Moore . . . . They then started trying to ping the phone to locate . . . Mr. Moore, and they were successful in locating him later on that evening, early morning hours.

They also located the driver of the car, . . . Thomas Watson. And after interviewing everybody, including . . . [the Defendant], the conclusion was that [the Defendant] was the shooter, Mr. Moore had set up the deal, and Mr. Watson was the driver.

Referring to the plea agreement, the twenty-five-year-old Defendant stated under oath that he read it, that he reviewed it with trial counsel, that he understood the terms, and that he signed it. The Defendant stated that nobody had forced him to plead guilty and that he had not been promised anything beyond the terms of the agreement. The Defendant had a high school education.

The trial court reviewed the terms of the plea agreement, which included a dismissal of the first degree premediated murder charge. The Defendant understood that he was pleading guilty to voluntary manslaughter, as a lesser included offense of first degree felony murder, with an agreed-upon sentence of six years' confinement at thirty percent service. The Defendant, likewise, understood that he was pleading guilty to aggravated robbery with an agreed-upon sentence of twelve years' confinement at eighty-five percent service. The Defendant understood that the sentences would be served consecutively, which he understood as "[s]tacked," and that the effective sentence was eighteen years. The court noted the nearly three years of pretrial jail credit and asked if the Defendant had "[a]ny questions about anything we've covered so far." The Defendant responded, "No, sir."

The Defendant stated that he could pass a drug screen and that he was not taking any medication. When asked if he was satisfied with trial counsel's representation, the Defendant responded, "Yes, sir." The Defendant said that counsel had reviewed the evidence with him and that there was nothing more he wanted counsel to do that counsel had not done. The Defendant understood that by pleading guilty, he waived his rights to a jury trial, to subpoena and present witnesses, to cross-examine witnesses, to remain silent, and to appeal. The Defendant understood that the convictions would be permanent and could be used to enhance the sentence of any subsequent conviction. The Defendant stated that he was guilty of voluntary manslaughter and aggravated robbery. The trial court accepted the Defendant's guilty pleas and sentenced the Defendant pursuant to the plea agreement. The judgments were entered on July 19, 2023.

**Motion to Withdraw Guilty Pleas Hearing**

On July 24, 2023, eleven days after the Defendant entered guilty pleas, he filed a pro se motion to withdraw his guilty pleas, alleging that (1) his pleas were the result of "harassment, intimidation, and abuse throughout the criminal justice system," (2) he had a right to speedy trial and a "prompt and final conclusion of the case after the conviction or sentence," (3) he had the right to confer with the prosecutor about his case, and (4) he had the "right to be heard, when relevant, at all critical stages of the criminal justice process as defined by the General Assembly." The Defendant, likewise, raised complaints about trial counsel's representation similar to those he had raised before entering his guilty pleas. The Defendant stated in the motion that before his conference with trial counsel, codefendant Moore, and Mr. Scretchen, the Defendant knew his trial would begin the following week and that the pending trial date caused his post-traumatic stress disorder "to [a]ctivate in full effect which caused me to[] shut down[.]" He asserted that although he was physically present at the guilty plea hearing, he was "not there mentally," was "afraid," and did not understand what was happening.

The pro se motion to withdraw guilty pleas, likewise, alleged that during the conference with trial counsel and Mr. Scretchen, both attorneys intimidated him. The Defendant asserted that the attorneys stated, "This is real pressure and this is what it feels like[.]" The Defendant claimed that the attorneys told him to "stop shutting down" because there was not "time for that." The Defendant alleged that the attorneys asked if he wanted to be in his children's lives and advised he would receive an all-white jury, who looked nothing like him. The Defendant asserted that he was told to "protect" himself and that he felt "trapped," racially profiled, and scared for his life.

On August 10, 2023, the Defendant was appointed counsel for the motion hearing, which was held on October 31, 2023, and on November 6, 2023. At the motion hearing, the Defendant argued that because of the "ongoing conflict" with trial counsel, the Defendant feared what would occur if he pursued a trial and entered his guilty pleas under duress.

The Defendant testified that he understood the original charges would be reinstated if his motion were successful and that the prosecution might not extend any plea offers. He said that he was arrested on September 21, 2020, and that issues with trial counsel began when they met. The Defendant said that at their meeting in 2021, trial counsel told the Defendant that he would receive a life sentence but that he did not know how to request a new attorney. The Defendant acknowledged that he filed a complaint with the Board of Professional Responsibility but that counsel did not discuss the complaint or the Defendant's concerns.

-5-

The Defendant testified that the trial was scheduled for August 29, 2022, but that it was continued due to an illness of a codefendant's attorney. The Defendant said that before this first trial date, trial counsel said he could obtain a plea offer for voluntary manslaughter with a six-year sentence and that they talked two to three times. The Defendant said that after the trial was rescheduled to July 2023, he and counsel did not have a relationship and that he only spoke to counsel when it was nearing the July 2023 trial date. The Defendant said that he and his family attempted to contact counsel, that counsel did not convey any plea offers before the July 2023 trial date, and that he and counsel met nine to ten days before the July 2023 trial date. The Defendant said he told counsel that he did not want a plea agreement, although counsel continuously advised him to accept a plea offer if an offer were conveyed by the State. The Defendant said that as a result, their communication was not "fruitful" and that they never discussed trial strategy or the next steps in the case. The Defendant did not think counsel would be prepared for a trial because counsel did not want to proceed to a trial after the State conveyed an offer for fifteen years at 100% service. The Defendant said he did not want to accept the offer.

The Defendant testified that on July 13, 2023, he attempted to express his concerns about trial counsel to the trial court and that he learned during the hearing on counsel's motion to withdraw that a codefendant would testify unfavorably against him. Referring to his conference with trial counsel, codefendant Moore, and Mr. Scretchen, the Defendant said that they discussed the State's offer and that both attorneys provided him with reasons why he needed to accept the offer. He said both attorneys said that he and codefendant Moore, who was the Defendant's half-brother, did not need to proceed to a trial, that none of the jurors would "look like you," and that "this is what real pressure feels like." The Defendant said that he "was zoned out" and was not "there mentally" for the conversation. He said the plea offer was contingent upon his and codefendant Moore's acceptance. The Defendant said he did not know what to do, was scared, "felt forced," and "felt backed into a corner." He said the conference lasted about thirty minutes. He said that he wanted to fight for his innocence but that he never spoke to counsel privately to discuss the plea offer and the impact the severance would have at a trial.

The Defendant testified that he never intended to accept a plea offer with a long sentence but that he would have considered a six-year sentence. He said that he did not think trial counsel was prepared for a trial and that he understood he faced a life sentence if convicted at a trial. He said that he was scared, felt backed into a corner, and felt he did not have a choice but to plead guilty.

On cross-examination, the Defendant testified that he dropped out of high school in the twelfth grade, that he was literate, and that he had understood all the proceedings in his case and what had occurred. He did not recall having any gang affiliation. The trial court interjected, asking if the Defendant was testifying under oath that he did not recall having any gang affiliation, and the Defendant stated he was not in a gang. He clarified that he

had been "affiliated, being a part of the gang, but not in a gang." He said that some of his family members were gang members.

The Defendant testified that codefendant Moore arranged to meet the victim in the parking lot. The Defendant said that he left the car and "did the exchange." He said that his gun was concealed during the exchange and agreed that it was his "gun that's fired [and] ultimately kills the victim in this case."

The Defendant testified that he did not understand what was happening when he, trial counsel, codefendant Moore, and Mr. Scretchen met before the guilty plea hearing. The Defendant reviewed the guilty plea hearing transcript and acknowledged the trial court's questions and his responses. He said, though, that he lied at the guilty plea hearing because trial counsel and Mr. Scretchen threatened him. He said that their threat was that he would receive an "unfair trial because none of the jurors looked like me, multiple things, a lot of things." The Defendant said, "[T]hat's racial profiling by saying that it will be a[n] all-white jury and they don't look like you and they don't care about your situation." The Defendant stated that an additional threat by counsel was that the trial judge "doesn't play" and that counsel was "putting me in fear of the judge and multiple threats." The Defendant said counsel threatened that the Defendant would never see his children again. The Defendant clarified he considered counsel's threats to have been that he would have an all-white jury, that he would receive a long sentence, which would prevent him from watching his children grow up, and that the trial court imposed long sentences.

Upon questioning by the trial court about the Defendant's claims in his pro se motion, the Defendant testified relative to his claim that he had the right to be free from harassment, intimidation, and abuse throughout the criminal justice system that trial counsel intimidated and forced him to do "things" he did not want to do and that he was forced into representation by counsel. When asked if counsel intimidated him before the day of the guilty plea hearing, the Defendant stated that counsel "forcefully" attempted to convince him to accept a thirty-year plea offer, which he said was the only offer extended by the State before the guilty plea hearing.

The Defendant testified that his claim that he had the right to a speedy trial or to a prompt conclusion of the case referred to his complaint to trial counsel about wanting a speedy trial. The Defendant acknowledged that he initially believed he had the right to confer with the prosecutor about his case referred to his initial belief that the prosecutor could speak directly to him, although he was represented by counsel but that he had since learned it was not possible for the prosecutors to speak directly to him.

Relative to his claim that he had the right to be heard, the Defendant testified that he told trial counsel to do "things" but that his requests were unfulfilled. The Defendant said that he asked counsel to file a motion for a speedy trial, among other unspecified

motions, that counsel said he could file the motions, and that counsel said counsel did not "know the outcome of my motions."

The Defendant testified that at the time of the offenses in this case, he was serving a four-year sentence on probation for a theft conviction and that his probation was revoked. He said that he had previous misdemeanor convictions for driving with a suspended license, possession of marijuana, and assault. He stated that he pleaded guilty to felony theft, that the trial judge asked the same questions at the theft-related guilty plea hearing as the judge asked at the guilty plea hearing in this case, and that he knew the questions the judge would ask when he pleaded guilty in this case. The Defendant maintained, though, that he lied to the trial court when he entered his guilty pleas in this case. When asked why the court should believe his testimony, the Defendant said because the court understood he was unhappy with trial counsel.

The Defendant testified that although trial counsel and Mr. Scretchen threatened him, the "ultimate threat" came from the trial court. The Defendant said that although he informed the court that he was not being represented and treated fair, the court "forced" him to be represented by an attorney whom he felt was not providing adequate representation. The Defendant said that a trial was scheduled for the following week and that he could not proceed to a trial "knowing in [his] heart" counsel was not representing him to the best of counsel's ability.

Derrick Scretchen, codefendant Moore's counsel, testified that codefendant Moore entered guilty pleas on the same day as the Defendant. Mr. Scretchen stated that he was present when trial counsel requested permission to withdraw and that after the trial court denied the request, Mr. Scretchen requested the conference with codefendant Moore, trial counsel, and the Defendant because the State had extended a new plea offer earlier that morning. Mr. Scretchen explained that the State previously conveyed offers of forty and fifteen years to codefendant Moore but that on July 13, 2023, the State extended the contingent offer, which the Defendant and codefendant Moore accepted. Mr. Scretchen recalled that on July 13, he learned that codefendant Watson's case had been severed and that codefendant Watson would testify at the Defendant and codefendant Moore's joint trial, which had been scheduled for the following week.

Mr. Scretchen testified that he believed the conference was necessary based upon the new plea offer, the new severance, and the new witness. He said that he spoke to the Defendant but that he spoke primarily to codefendant Moore. Mr. Scretchen said that after a general conversation about "where we were" and the implications of the severance and the offer, codefendant Moore ultimately wanted to accept the offer. Mr. Scretchen said that the Defendant and codefendant Moore each had many questions about what was going on with their respective cases and that Mr. Scretchen and trial counsel each answered their questions. Mr. Scretchen recalled that he told the Defendant and codefendant Moore what

to expect at a murder trial before the trial judge and "paint[ed] the context for what" was happening. Mr. Scretchen said that trial counsel also spoke to the Defendant and codefendant Moore and that the Defendant and codefendant Moore talked to each other. Mr. Scretchen said that he probably spoke about 60% of the time and that trial counsel spoke about 40% of the time regarding general information but that trial counsel spoke directly to the Defendant. Mr. Scretchen said he spoke directly to codefendant Moore. Mr. Scretchen stated that he would do whatever he could within the bounds of the law to benefit his client. Mr. Scretchen acknowledged that his function was to explain to codefendant Moore how the offer benefited codefendant Moore but that the decision to accept the offer belonged to codefendant Moore. Scretchen said that codefendant Moore and the Defendant both wanted to accept the offer.

Mr. Scretchen testified that at the conclusion of the conference, the Defendant decided that accepting the offer was "the best thing for him to do." Mr. Scretchen said that during the guilty plea hearing, the Defendant confirmed his decision to accept the offer. Mr. Scretchen said that the conference lasted approximately one hour, that the Defendant wanted to speak privately with counsel, and that two hours elapsed between the beginning of the conference and the entry of the guilty pleas. Mr. Scretchen did not recall if trial counsel met privately with the Defendant.

On cross-examination, Mr. Scretchen testified that he did not threaten the Defendant but that defendants sometimes perceived the "realities of the situation as threats." Mr. Scretchen stated that difficult decisions had to be made, given the trial was scheduled for the following week and that the communication was direct. Mr. Scretchen said he, trial counsel, and codefendant Moore did not threaten the Defendant into pleading guilty. Mr. Scretchen said he did not observe trial counsel do anything inappropriate or threatening toward the Defendant. Mr. Scretchen said that the discussion was tense in the context that the Defendant had to decide whether to plead guilty to voluntary manslaughter, which required prison time but less than a life sentence for a first degree murder conviction at a trial. Mr. Scretchen said that a voluntary manslaughter conviction would provide the Defendant and codefendant Moore with the opportunity "to be with . . . family again."

Mr. Scretchen testified that the day of the guilty plea hearing, which was about five days before the trial date, was different from the "whole length of this case that lasted two years." He said that the guilty plea hearing date was the first time he and trial counsel learned about the severance, about codefendant Watson's testifying for the prosecution, and about the plea offer ultimately accepted by the Defendant and codefendant Moore. Mr. Scretchen said the goal of the conference was simply to explain the significance of those developments to the Defendant and to codefendant Moore.

At the conclusion of the proof, the trial court found that Mr. Scretchen "helped the defendant from a possible first or second degree murder conviction, and he ends up pleading guilty to voluntary manslaughter. So I don't think that troubled the Defendant." The court determined that the conference helped the Defendant "come to his senses" based upon the evidence. The court, referring to the affidavit in the court file, stated the evidence showed that the Defendant was the shooter and that the Defendant was found with the gun and one-quarter pound of marijuana taken from the victim.

The trial court addressed the Defendant and stated that, based upon the testimony, he was "in a sense alleging ineffective assistance of counsel" and that he would be barred from raising ineffective assistance in a post-conviction proceeding. Before adjudicating the motion to withdraw the guilty pleas, the court requested that the prosecution supplement the record with "the basis of the investigation" and copies of the Defendant's and the codefendants' pretrial statements.

On November 6, 2023, the motion hearing resumed, after the trial court had reviewed the original charges, the terms of the plea agreement, and the Defendant's motion to withdraw his guilty pleas. The court noted that the Defendant alleged as a basis to withdraw his guilty pleas that he had the rights to a speedy trial and to be free from harassment, intimidation, and abuse. The court found that the Defendant's trial was scheduled for the week after the Defendant entered his guilty pleas. The court noted that the Defendant likewise alleged that he had the rights to confer with the prosecutor and to be heard at all critical stages of the criminal justice process.

The trial court said that the Defendant alleged "what amounts to ineffective assistance of counsel." The court found that trial counsel was appointed on March 29, 2021, after the Defendant was unable to retain counsel. The court found that "problems" arose between counsel and the Defendant and that the Defendant filed a Board of Professional Responsibility complaint against counsel and asked the board to appoint another attorney in this case, which it declined to do. The court found that the Defendant "just kind of sat on" the complaint, which was filed more than one year before the guilty plea hearing. The court found that the second trial date was July 18, 2023, and that on July 13, 2023, the Defendant learned codefendant Watson would testify against him and codefendant Moore. The court found that a motion to sever had been filed and that the State extended the plea offer accepted by the Defendant.

In denying the motion to withdraw guilty pleas, the trial court determined that the Defendant had failed to establish a manifest injustice. The court noted that the Defendant was charged with first degree murder and faced a possible life sentence but that the Defendant pleaded guilty to voluntary manslaughter and received a six-year sentence. The court found that the Defendant could, likewise, not establish a manifest injustice in connection with the twelve-year sentence for aggravated robbery because the evidence

showed that the Defendant shot the victim. The court stated that if the Defendant had been convicted of first degree murder and aggravated robbery at a trial, he faced a possible life sentence for murder and consecutive service with the aggravated robbery sentence. The court found that the Defendant had received "a lot of mercy" but that the Defendant did not "seem to understand one bit of it."

The trial court credited Mr. Scretchen's testimony relative to the conference before the Defendant entered the guilty pleas. The court found that after the conference, the Defendant appeared to the court that he was "ready, willing, and able to accept this incredible offer in light of the evidence in the case." The court found that the conference lasted about an hour.

The trial court reviewed trial counsel's motion to withdraw and determined that the Defendant was "playing" the court. The court found that the Defendant refused to meet with counsel four times in preparation for a trial.

The trial court reviewed the guilty plea colloquy and determined that Defendant knowingly and voluntarily entered guilty pleas. The court found that, based upon Mr. Scretchen's testimony, there was not any force or coercion used during the conference. The court discredited the Defendant's testimony.

The trial court reviewed the supplemental materials, which included the police report and the pretrial interviews of the Defendant and the codefendants. The police report reflected, in relevant part, that the victim met the Defendant and the codefendants to sell what the victim's girlfriend believed to be a pair of shoes. The victim's girlfriend drove the victim to Dodge's Chicken to sell the shoes and parked her car beside a black sedan. The Defendant, who had been the front passenger, left the sedan and attempted to get inside the victim's girlfriend's car, but the victim told the Defendant not to enter the car and began discussing a price for the shoes. The Defendant yelled to someone inside the sedan for additional money, and the Defendant fired a gun at the victim. The victim's girlfriend drove to the hospital. Codefendant Watson was identified as the driver and owner of the sedan, and codefendant Moore was identified as the rear passenger. The victim's cell phone records showed that the meeting was an intended drug deal, and codefendant Moore admitted that he arranged the meeting to purchase marijuana. Codefendant Moore told the police that the Defendant carried a fuchsia backpack and that the Defendant placed the marijuana the Defendant took from the victim inside the backpack. Codefendant Moore told the police that the victim fired two gunshots before the Defendant shot at the victim. Codefendant Watson, likewise, told the police that the Defendant shot the victim after the victim fired two gunshots at the Defendant.

The supplemental materials reflected that the Defendant admitted shooting the victim and that the Defendant possessed a fuchsia backpack, which contained seventy-eight grams of marijuana. The gun used during the shooting was found wrapped in a black plastic bag behind the Defendant's home, and the Defendant admitted that the gun was used to shoot the victim. The Defendant told the police that the victim immediately fired two gunshots at the Defendant when he attempted to get inside the victim's girlfriend's car. The Defendant stated that one bullet grazed his arm, but the officers did not see any wounds to substantiate the Defendant's statement. The Defendant said he returned fire when he ran from the victim's girlfriend's car. The victim's autopsy report reflected that the victim suffered eleven gunshot wounds inflicted by eight bullets. The victim's gunshot wounds were to the right eye, bottom lip, back, knee, arms, and shoulders, and the stippling indicated the gun was fired at close range.

The trial court concluded, that based upon the evidence, the Defendant faced an "extreme likelihood" of being convicted of first degree murder at a trial and that his guilty pleas were "as far away from manifest injustice as it could be." The court found that the Defendant benefited from the plea agreement and found that the Defendant shot the victim eight times, took marijuana, ran from the scene, and hid the gun. The court denied the Defendant's motion to withdraw his guilty pleas.

In connection with the Defendant's ineffective assistance of counsel allegation, the trial court determined that trial counsel did not provide ineffective assistance based upon the evidence presented at the guilty plea hearing, the motion to withdraw guilty pleas hearing, and the motion to withdraw as counsel hearing.

On February 9, 2024, the trial court entered a written order denying the Defendant's motion to withdraw his guilty pleas. The court determined, after considering testimony from the Defendant and Mr. Scretchen, transcripts from previous proceedings, and statements of trial counsel, the Defendant failed to establish a manifest injustice. This appeal followed.

The Defendant contends that he received the ineffective assistance of counsel, which resulted in a manifest injustice and that, as a result, the trial court abused its discretion by denying his motion to withdraw his guilty pleas. The Defendant asserts that he would not have pleaded guilty in the absence of counsel's ineffective assistance. He argues that counsel's failure to communicate resulted in fear and uncertainty, that he felt pressured and forced to accept the plea offer on the day of the guilty plea hearing, and that his guilty pleas were unknowingly and involuntarily entered. The State responds that the trial court did not abuse its discretion by denying the motion to withdraw guilty pleas because the Defendant entered knowing and voluntary guilty pleas and because the Defendant failed to establish his ineffective assistance claim. We agree with the State.

-12-

Tennessee Criminal Procedure Rule 32(f)(2) states that after a trial court has imposed sentence but before a judgment becomes final, "the court may set aside the judgment of conviction and permit the defendant to withdraw the guilty plea to correct manifest injustice." Once a defendant enters a guilty plea, the judgment of conviction "becomes final thirty days after acceptance of the plea agreement and imposition of [the] sentence," meaning a defendant "has thirty days within which to . . . [file] a motion to withdraw the previously entered plea pursuant to Rule 32(f)." *State v. Green*, 106 S.W.3d 646, 650 (Tenn. 2003). A trial court's determination regarding a motion to withdraw a guilty plea is reviewed for an abuse of discretion. *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). An abuse of discretion occurs when a trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, . . . applies reasoning that causes an injustice to the complaining party . . . [and] fail[s] to consider the relevant factors provided by higher courts as guidance for determining an issue." *Id.* In determining whether to grant a motion to withdraw a guilty plea, trial courts "should always exercise . . . discretion with caution in refusing to set aside a plea of guilty, to the end that one accused of crime may have a fair and impartial trial." *Id.* at 444 (internal quotation and citation omitted).

Rule 32(f) does not provide "a criminal defendant who has [pleaded] guilty . . . a unilateral right to later withdraw his plea either before or after sentencing." *Id.*; *see State v. Crowe*, 168 S.W.3d 731, 740 (Tenn. 2005); *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003). "The defendant bears the burden of establishing sufficient grounds for withdrawing [a] plea." *Phelps*, 329 S.W.3d at 444; *see State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). Our supreme court has found manifest injustice when

> (1) the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland* . . . and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

*Crowe*, 168 S.W.3d at 742 (citations omitted). However, a defendant's "change of heart" about pleading guilty, "dissatisfaction" with the punishment imposed, or the entry of a guilty plea to avoid a harsher sentence does not constitute a manifest injustice. *See Turner*, 919 S.W.2d at 355.

## A.  Knowing, Voluntary, and Intelligent Guilty Pleas

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North*

*Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *Turner*, 919 S.W.2d at 353. A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A defendant's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The record reflects that the Defendant entered knowing, voluntary, and intelligent guilty pleas. The Defendant was indicted for two counts of first degree murder and aggravated robbery, and if he were convicted at a trial, his exposure included a life sentence and potential consecutive service of the sentences. We note that the Defendant was serving a felony sentence on probation at the time of the present offenses and that his probation was subsequently revoked. *See* T.C.A. § 40-35-115(b)(6) (2019) (consecutive service). Although the Defendant complained about trial counsel's representation before the guilty plea hearing, the Defendant had refused counsel's attempts to meet with him to discuss various aspects of the case before the upcoming trial date. Upon learning about codefendant Watson's severance and anticipated testimony at the Defendant's trial the following week and about the contingent plea offer, a conference was held among the Defendant, trial counsel, codefendant Moore, and Mr. Scretchen to discuss the implications of the recent developments.

After the conference, the Defendant accepted the plea offer and entered guilty pleas to voluntary manslaughter, as a lesser included offense of first degree felony murder, and to aggravated robbery. The first degree premeditated murder charge was dismissed, and he received an agreed-upon effective sentence of eighteen years' confinement. Although the Defendant asserts that he felt pressured and threatened to accept the plea officer, the Defendant's sworn statements and acknowledgments at the guilty plea hearing reflect otherwise.

At the guilty plea hearing, the Defendant stated that he had read the plea agreement, that he and trial counsel had reviewed it, and that he understood the terms of the agreement. The Defendant understood that he was pleading guilty to voluntary manslaughter, as a lesser included offense of first degree felony murder, that the first degree murder charge would be dismissed, and that he would receive a six-year sentence. The Defendant, likewise, understood that he was pleading guilty to aggravated robbery, and that he would receive a twelve-year sentence. The Defendant acknowledged that the sentences would be

"stacked," and he understood that the effective sentence was eighteen years. The Defendant did not have any questions for the trial court regarding the terms of the plea agreement. He stated that nobody had forced him to plead guilty and that he had not been promised anything beyond the terms of the plea agreement.

The Defendant had not taken any medications before the guilty plea hearing, and he told the trial court that he was satisfied with trial counsel's representation. The Defendant and counsel had reviewed the evidence, and there was nothing the Defendant wanted to counsel to do that counsel had not done. The Defendant understood that by pleading guilty, he waived his rights to a jury trial, to subpoena and present witnesses, to cross-examine witnesses, to remain silent, and to appeal. The Defendant admitted he was guilty of voluntary manslaughter and aggravated robbery.

The trial court determined that at the time of the guilty plea hearing, the Defendant was "ready, willing, and able to accept this incredible offer in light of the evidence in the case." The supplemental evidence reviewed by the court reflected that the Defendant admitted to shooting the victim, taking marijuana from the victim, fleeing from the scene, and hiding the gun used during the offenses. The victim suffered eleven gunshot wounds inflicted by eight bullets fired from close range.

At the motion to withdraw guilty pleas hearing, the Defendant testified that he could read and that he understood all the proceedings in his case and what had occurred. However, he stated that he did not understand what was happening during the conference with trial counsel, codefendant Moore, and Mr. Scretchen. Although the Defendant asserted that he lied during the guilty plea hearing, the trial court discredited the Defendant's testimony, including that trial counsel and Mr. Scretchen threatened and forced him to plead guilty. The Defendant had experience with the criminal justice system, and he had previous misdemeanor and felony convictions. Based upon this experience, the Defendant was familiar with a guilty plea colloquy, and he acknowledged that he knew the questions the trial judge would ask at the guilty plea hearing.

Mr. Scretchen's credited testimony reflects that neither he nor trial counsel threatened, forced, or coerced the Defendant to plead guilty during the approximate one-hour conference before the guilty plea hearing. The conference focused on the implications of the State's decision to sever codefendant Watson's trial, codefendant Watson's anticipated testimony against the Defendant and codefendant Moore, and the contingent plea offer. The Defendant asked many questions, which were answered, and at the end of the conference, the Defendant wanted to accept the offer. Mr. Scretchen's testimony reflects that trial counsel did not engage in any inappropriate or threatening behavior directed at the Defendant. The record supports the trial court's determination that the Defendant understood the guilty plea proceedings, understood the terms of the plea agreement, and entered knowing, voluntary, and intelligent guilty pleas. The entry of a

guilty plea to avoid a harsher sentence or a change of heart after pleading guilty does not constitute a manifest necessity. *See Turner*, 919 S.W.2d at 355. The trial court did not abuse its discretion by denying the motion to withdraw guilty plea on this basis, and the Defendant is not entitled to relief.

## B.    Ineffective Assistance of Counsel

To establish a claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a defendant has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A defendant must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a defendant must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The trial court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. To establish the prejudice prong, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Defendant asserts that he was "deprived of communication" with trial counsel during the time leading to the trial, that he was unaware of trial strategy and developments in the case, and that he feared counsel was unprepared for a trial. Although he acknowledges in his appellate brief that he "failed to make [and] broke off meetings" with counsel, the Defendant asserts that he questioned and doubted counsel's ability to formulate an effective trial strategy. He argues that proceeding to a trial without "a prepared and supportive attorney" left "him with the stark reality that he had no choice but" to accept the plea offer.

As a preliminary matter, the Defendant did not present trial counsel as a witness at the motion hearing, and this court will not speculate about the nature of any evidence, including counsel's preparation and trial strategy, which was not presented at the hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In any event, the record

-16-

reflects that trial counsel attempted to meet with the Defendant multiple times to prepare for the July 18, 2023 trial and that the Defendant terminated the meetings or refused to meet with counsel. Although the Defendant requested new counsel on July 13, 2023, approximately five days before the scheduled trial, he failed to articulate any meaningful reason to warrant the appointment of another attorney. The Defendant said, "I just feel like I'm not being represented." He complained about the frequency with which counsel spoke to him and about counsel's failure to file a motion for a speedy trial, although his trial was scheduled for the following week. He, likewise, questioned whether counsel was prepared for a trial. However, the trial court determined that the Defendant was the "problem" for refusing to meet with counsel, which was counterproductive to the Defendant's desired goals. Counsel attempted to speak with the Defendant before the hearing on counsel's motion to withdraw, but the Defendant refused. The Defendant continued his refusal to speak to counsel until he learned about the severance of codefendant Watson's trial, codefendant Watson's anticipated trial testimony, and the contingent plea offer.

Although the Defendant stated that he feared trial counsel was unprepared for a trial, he presented no evidence showing what counsel failed to do to be prepared for a trial. In fact, the proof showed counsel's numerous attempts to meet with the Defendant. As the trial court determined, trial preparation, without the Defendant's cooperation, placed counsel "in an extremely difficult position." The court discredited the Defendant's testimony at the motion to withdraw guilty pleas hearing, and it credited Mr. Scretchen's testimony that the Defendant's guilty pleas were not the result of force, threats, or coercion by trial counsel. At the guilty plea hearing, the Defendant stated that he was satisfied with counsel's representation, that he and counsel had reviewed the evidence, and that there was nothing he wanted counsel to do that counsel had not done. After acknowledging counsel's satisfactory representation, the Defendant entered knowing, voluntary, and intelligent guilty pleas. As a result, the record does not preponderate against the court's determination that the Defendant failed to establish his ineffective assistance claim in connection with his guilty pleas, and the court did not abuse its discretion by denying the motion to withdraw guilty pleas on this basis. The Defendant is not entitled to relief.

We conclude that the trial court did not abuse its discretion by denying the Defendant's motion to withdraw his guilty pleas because his pleas were knowingly, voluntarily, and intelligently entered and because he did not establish that he received the ineffective assistance of counsel in connection with his guilty pleas. The court did not err by determining that the Defendant failed to establish a manifest injustice existed to permit him to withdraw his guilty pleas, and he is not entitled to relief. The judgments of the trial court are affirmed.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE